**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CAITLIN KELLY HENRY, ET AL,

        Plaintiffs,

    v.

DEPARTMENT OF JUSTICE,

        Defendant.

_____/

No. C-13-05924 DMR

**ORDER ON PARTIES' CROSS
MOTIONS FOR SUMMARY
JUDGMENT [DOCKET NOS. 25, 36]**

      Plaintiffs Caitlin Kelly Henry and Jesse Stout bring this action for injunctive relief pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, against Defendant Department of Justice ("DOJ"). The parties filed cross motions for summary judgment. [Docket Nos. 25 (Def.'s Mot.), 36 (Pls.' Mot.).] Following a hearing, the court ordered Defendant to submit supplemental evidence and briefing, to which Plaintiffs responded. [Docket Nos. 47, 48, 49.] Having carefully considered the parties' arguments and the relevant legal authority, and having had the benefit of oral argument, the court hereby grants Defendant's motion for summary judgment and denies Plaintiffs' motion for summary judgment.

## I. Background

      Plaintiffs are lawyers and legal scholars specializing in criminal justice reform. (*See* Compl. ¶¶ 8-12.) They represent each other in this action. Thus, Henry filed FOIA requests seeking records pertaining to Stout, and Stout filed requests seeking records pertaining to Henry. Plaintiffs

challenge the results of nine separate FOIA requests to the FBI and United States Attorney's

Offices.

**A.**     **Requests to the FBI**

On May 1, 2013, Plaintiffs each submitted a request to the FBI seeking records related to

themselves, including "emails, Complaint Forms, Memorandums of Investigation, Reports of

Investigation, Field Operation Worksheets, Arrest Reports, Agents' notes, arrest evaluations, and

investigation."  (Hardy Decl., Sept. 25, 2014, Ex. A (Stout request on behalf of Henry, "Henry's

request"), and Ex. I (Henry request on behalf of Stout ("Stout's request")).)  The requests provided

date ranges for requested documents, states of residence during relevant time periods, and lists of

"[a]ssociated key words."[1]  They requested that the FBI search "both the automated and the older

general (manual) indices for all records (in any form or format, including multimedia and all types

of electronic records) related in whole or in part" to themselves.  (Hardy Decl. Exs. A, I.)  In

connection with their requests for public interest fee waivers, *see* 5 U.S.C. § 552(a)(4)(A)(iii),

Plaintiffs explained that they sought the information in order to advance their understanding about

the surveillance of social justice advocates:

> This request is made in the process of news-gathering about surveillance, and not
> for commercial usage.  The specific operations of government to which the request
> relates is about surveillance of people who advocate for prisoners and racial,
> criminal, and social justice.  Publication of information about monitoring of
> advocates will contribute significantly to a public understanding of how to perform
> lawful advocacy on behalf of marginalized populations.  In particular, attorneys
> would benefit from understanding of how traditionally legally privileged
> communications have been monitored.

(Hardy Decl. Exs. A, I.)  The FBI processed and responded to these requests.

**1.**     **Henry's FBI Request**

With respect to Henry, the FBI conducted a search of its automated and manual indices to the

Central Records System[2] ("CRS") for the applicable time period.  It used a three-way phonetic

---

[1] In addition to various forms of each Plaintiff's name, Stout provided approximately 37 associated key words for Henry and Henry provided approximately 36 key words for Stout.

[2] The systems searched by the FBI are described in detail below in the court's discussion of the reasonableness of the search.

United States District Court

For the Northern District of California

breakdown of Henry's name, plus a fourth variation provided by Henry.[3] (Hardy Decl. ¶ 29.)  It also used her date of birth and social security number in combination with the name variations.  (Hardy Decl. ¶ 29.)  It did not locate any responsive main file records.

On May 9, 2013, the FBI issued a response to Henry advising her that a search of CRS had not yielded any main file records responsive to her request, and informing her of her appeal rights.[4] (Hardy Decl. Ex. C.)  Henry appealed the FBI's response to the Office of Information Policy ("OIP") by letter dated May 29, 2013, requesting that the FBI "perform a more thorough and adequate search in the Central Records System" to include the FBI's "automated indices and the older general (manual) indices," as well as a "cross reference search."  (Hardy Decl. Ex. D.)  On August 6, 2013, OIP advised Stout, on behalf of Henry, that it affirmed the FBI's actions.  The OIP determined that the FBI had conducted an adequate, reasonable search for the records, noting that the FBI had not searched its manual indices because they only contain records created before 1959.  (Hardy Decl. Ex. F.)  As to Henry's request for  a cross reference search, OIP advised that Henry needed to provide information sufficient to enable the FBI "to determine with certainty that any cross-references it locates are identifiable to [Henry]."  (Hardy Decl. Ex. F.)  OIP notified Henry that if she was dissatisfied with the determination, she could seek judicial review.

Plaintiffs filed the present lawsuit on December 21, 2013.  Upon receipt of the lawsuit, the FBI conducted another search of CRS, using both the automated and manual indices, as well as cross references using the same phonetic searches of Henry's name.  It did not locate any responsive records.  (Hardy Decl. ¶ 30.)  In addition, since Henry's request sought "multimedia and all types of electronic records," the FBI conducted a discretionary search of its Electronic Surveillance

---

[3] Henry requested a search date range of October 27, 1983 to May 21, 2013, and Stout requested a date range of July 17, 1984 to May 21, 2013.  However, the FBI establishes the search cutoff date for a FOIA request as the date the Record/Information Dissemination Section ("RIDS") conducts its initial search for records pertaining to the request; here, May 6, 2013 for Henry and May 3, 2013 for Stout. (Hardy Decl. ¶¶ 29 n.8, 32 n.12.)  Therefore, the searches do not extend to May 21, 2013 as requested by Plaintiffs.  Plaintiffs do not challenge the search cutoff date.

[4] The letter also stated that "[i]n accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E)/Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists."  (Hardy Decl. Ex C (brackets in original).)  Plaintiffs do not challenge this portion of the FBI's response.

("ELSUR") indices, using four phonetic variations of Henry's name as well as her date of birth and social security number.  The ELSUR search yielded no responsive records.  (Hardy Decl. ¶¶ 33, 37.)

### 2.   Stout's FBI Request

The FBI conducted a similar search with respect to Stout's request.  It searched the automated and manual indices to CRS for the applicable time period using a three-way phonetic breakdown of Stout's name, as well as a fourth variation provided by Stout.  (Hardy Decl. ¶ 32.)  It also used his date of birth and social security number in combination with the name variations.  (Hardy Decl. ¶ 32.)  On May 6, 2013, the FBI issued a response advising Stout that it had not located any main file records responsive to his request following a search of the CRS, and informing him of his appeal rights.[5]  (Hardy Decl. Ex. J.)  On May 29, 2013, Stout appealed the FBI's response to OIP, requesting that the FBI "perform a more thorough and adequate search in the Central Records System" to include the FBI's "automated indices and the older general (manual) indices," as well as a "cross reference search."  (Hardy Decl. Ex. K.)  On September 10, 2013, OIP advised Henry, on behalf of Stout, that it affirmed the FBI's actions on his FOIA request, having determined that the FBI had conducted an adequate, reasonable search for the records.  (Hardy Decl. Ex. M.[6])

Upon receipt of the present lawsuit, the FBI conducted another search of CRS using both the automated and manual indices, as well as cross references using the phonetic searches of Stout's name.  The FBI did not locate any responsive records.  (Hardy Decl. ¶ 32.)  In addition, since Stout's request sought "multimedia and all types of electronic records," the FBI conducted a discretionary search of the ELSUR indices, using four phonetic variations of Stout's name as well as his date of

---

[5] The letter also stated that "[i]n accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E)/Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists."  (Hardy Decl. Ex J (brackets in original).)  As noted above, Plaintiffs do not appear to challenge this portion of the FBI's response.

[6] In its response, the OIP noted that the FBI had not searched its manual indices because those indices only contain records created before 1959.  However, David M. Hardy, the Section Chief of the Record/Information Dissemination Section, Records Management Division of the FBI, states that the FBI did in fact search its manual indices in response to Plaintiffs' requests, although the timing of the manual indices search is unclear.  (Hardy Decl. ¶¶ 29, 32, Exs. F, M.)  In a supplemental declaration, Hardy states that the FBI searched its manual indices because Plaintiffs specifically requested that they be searched.  (Hardy Decl., Dec. 8, 2014 ("Hardy Decl. II") ¶ 6 n.1.)  Neither party notes or explains this discrepancy.

United States District Court

For the Northern District of California

birth and social security number.  The ELSUR search yielded no responsive records.  (Hardy Decl. ¶¶ 33, 37.)

**B.      Requests to the Executive Office for United States Attorneys**

Plaintiffs submitted the same FOIA requests to the "FOIA/PA[7] Mail Referral Unit" of the DOJ, Justice Management Division.  That unit referred Plaintiffs' requests to the Executive Office for United States Attorneys ("EOUSA").  (Francis Decl., Oct. 2, 2014, Exs. A (Stout request on behalf of Henry), L (Henry request on behalf of Stout).)  EOUSA forwarded each request to the United States Attorney's Offices ("USAO") in each of the states where Plaintiffs had resided during the time period covered by the requests, directing each office to search for responsive records and assigning each of the forwarded requests a different request number.  (Francis Decl. ¶¶ 4-6, 14-16.)  As discussed further below, the USAOs did not locate any responsive records and notified Plaintiffs of this fact, as well as their administrative appeal rights.  (Francis Decl. ¶¶ 8-11, Exs. C-K (Henry's requests); ¶¶ 18-21, Exs. N-S (Stout's requests).)  Neither plaintiff filed an administrative appeal of the responses, and instead filed this lawsuit.[8]

**1.      Henry's EOUSA Requests**

Henry's request noted that she had lived in California, New York, and Illinois during the time period covered by her request.  The EOUSA forwarded her request to the USAOs in the states in which she had resided.  Henry only challenges the responses to the requests made to the USAO for the Northern District of California, Central District of California, and Western District of New York.

**a.      Northern District of California (NDCA)**

In the 1990s, USAOs across the nation implemented a computerized docketing/case management system known as the Legal Information Office Network System, or "LIONS," which

---

[7] Privacy Act ("PA"), 5 U.S.C. § 552a.

[8] A party must exhaust administrative remedies under FOIA before seeking judicial review.  "The complainant must request specific information in accordance with published administrative procedures, and have the request improperly refused before that party can bring a court action under the FOIA."  *In re Steele*, 799 F.2d 461, 466 (9th Cir. 1986) (internal citations omitted).  Defendant does not argue that  Plaintiffs failed to exhaust administrative remedies with respect to any of their FOIA requests.

1  tracks cases and investigative matters.  Active cases were moved to LIONS and closed cases were

2  purged.  (Margen Decl., Oct. 1, 2014, ¶ 5a.)  In response to Henry's request, NDCA's FOIA/PA

3  point of contact, Lilibeth Margen, conducted a search of LIONS for records referring to Henry,

4  using the variations of her name provided by Henry in her request.  Margen also conducted a

5  discretionary search of the electronic docket of the United States District Court for the NDCA to

6  search for cases in which Henry was a party or attorney.  These searches revealed no records

7  involving Henry.  (Margen Decl. ¶ 5.)  After Plaintiffs filed this complaint, Margen conducted a

8  search of LIONS using each of the "associated key words" listed in Henry's request, but located no

9  responsive records.  (Margen Decl. ¶ 5.)

10          **b.       Central District of California (CDCA)**

11          Christine Salazar, CDCA's FOIA/PA point of contact, searched LIONS using every variation

12  of Henry's name that was provided in her request.  She located no matters in the CDCA regarding

13  Henry.  (Salazar Decl., Sept. 24, 2014, ¶ 9.)  Salazar also asked the Criminal Dockets, Civil Dockets,

14  and Records managers for the CDCA to conduct searches to determine if there were any responsive

15  records, including searching any matters purged from LIONS.  No responsive documents were

16  found.  In addition, using all variations of Henry's name, Salazar conducted a discretionary search of

17  the federal courts' Public Access to Court Electronic Records system ("PACER"), which provides

18  case and docket information for federal cases.  The search located no cases involving Henry. After

19  Plaintiffs filed suit, Salazar conducted a search of LIONS using all the "associated key words"

20  provided in the request and located no responsive records.  (Salazar Decl. ¶ 9.)

21          **c.       Western District of New York (WDNY)**

22          Andrea Venetian, the FOIA/PA point of contact for WDNY, searched LIONS using the

23  terms "Caitlin Kelly Henry," "Caitlin Henry," and "Jesse Stout," as Henry's attorney, and located no

24  responsive records.  (Venetian Decl., Sept. 24, 2014, ¶ 7.)  She used the same search terms to

25  manually search WDNY's card catalog file for cases predating LIONS.  Again, she located no

26  responsive records.  (Venetian Decl. ¶ 7.)

27          **2.       Stout's EOUSA Requests**

28

United States District Court

For the Northern District of California

Stout's request noted that he had lived in New Jersey, Rhode Island, and California during the period covered in his request, so EOUSA forwarded his request to the USAOs in those states. Stout only challenges the responses to requests sent to the USAO for the District of New Jersey, District of Rhode Island, Northern District of California, and Central District of California.

### a.   District of New Jersey (DNJ)

Gisele Bryant, the FOIA/PA point of contact for DNJ, searched LIONS using four variations of Stout's name, as well as all of the "associated key words" provided in the request. (Bryant Decl., Sept. 24, 2014, ¶ 6.) These searches located no responsive records. She also searched PACER to determine if there were any cases in the District Court in which Stout was a party or attorney, but did not locate any cases. Bryant also directed an administrative support assistant in the Records Department of USAO/DNJ to search a computerized index of archived cases that may have been purged from the LIONS database, as well as old index cards that identified old and/or destroyed files purged from LIONS. She did not locate any responsive records. (Bryant Decl. ¶ 7.)

### b.   District of Rhode Island (DRI)

Sandra Mascola, the FOIA/PA point of contact for DRI, searched LIONS for Stout's name, including the variations of his name and the "associated key words" provided in the request. She did not locate any responsive records. (Mascola Decl., Sept. 24, 2014, ¶ 7.) She also conducted a discretionary search of PACER using the variations of Stout's name to locate cases in DRI in which Stout was a party or attorney, and located no such cases. She emailed the Chiefs of the Civil and Criminal Division, United States Attorney, and First Assistant United States Attorney for DRI to ask if any of them knew of any cases that pertained to Stout. This did not yield any responsive documents. (Mascola Decl. ¶ 7 Ex. C.)

### c.   Northern District of California

Margen searched LIONS for records referring to Stout, using the variations of his name that were provided in his request. She also conducted a discretionary search of the electronic docket of the United States District Court for the Northern District of California to locate cases in which Stout was involved as a party or attorney. The searches yielded no records pertaining to Stout. (Margen

**United States District Court**
For the Northern District of California

1   Decl. ¶ 7.)  Margen later conducted a search on LIONS using each of the "associated key words"

2   listed in Stout's request but located no responsive records.  (Margen Decl. ¶ 7.)

3                    **d.      Central District of California**

4          Salazar searched LIONS using every variation of Stout's name that was provided in the

5   request, but located no matters in the Central District regarding Stout.  (Salazar Decl. ¶ 9.)  She also

6   asked the Criminal Dockets, Civil Dockets, and Records managers for the District to conduct

7   searches to determine if there were any responsive records, including searching any matters purged

8   from LIONS.  No responsive documents were found.  In addition, she conducted a discretionary

9   search of PACER, using all variations of Stout's name.  The search located no cases involving Stout.

10  After Plaintiffs filed suit, Salazar conducted a search on LIONS using all the "associated key words"

11  provided in the request and located no responsive records.  (Salazar Decl. ¶ 9.)

12  **C.     Procedural History**

13         Plaintiffs filed the instant lawsuit on December 21, 2013.  They allege that the FBI and

14  EOUSA violated FOIA by failing to adequately search for and produce records responsive to their

15  FOIA/PA requests.  They seek an order enjoining the agencies from continuing to withhold

16  responsive records and directing the agencies to produce the requested records without further delay.

17  They also seek attorneys' fees and costs.

18                            **II. Evidentiary Objections**

19         Plaintiffs attached eighteen exhibits directly to their motion.  Defendant objects to all of the

20  exhibits because Plaintiffs did not authenticate any of them pursuant to Federal Rule of Evidence

21  901.

22         Rule 901 provides that "[t]o satisfy the requirement of authenticating or identifying an item

23  of evidence, the proponent must produce evidence sufficient to support a finding that the item is

24  what the proponent claims it is."  Fed. R. Evid. 901(a); *see Orr v. Bank of Am.*, 285 F.3d 764, 773

25  (9th Cir. 2002) (noting that the Ninth Circuit has "repeatedly held that unauthenticated documents

26  cannot be considered in a motion for summary judgment," collecting cases).  Plaintiffs submitted a

27  declaration on reply in which Henry sets forth the websites from which she personally obtained the

28  exhibits attached to the motion.  Although it is improper and untimely to authenticate earlier

United States District Court

For the Northern District of California

1  submitted documents through a reply declaration, the court is satisfied that the exhibits are what they

2  purport to be and thus overrules Defendant's authenticity objections.

3      Defendant also objects to exhibits E, L, N, and Q to Plaintiffs' motion on the grounds that

4  they are inadmissible hearsay.  Fed. R. Evid. 801-803.  Exhibit E, from a website titled

5  "FierceGovernmentIT," is titled "Q&A: Jack Israel on FBI Sentinel and federal IT development

6  shortcomings."  Exhibit L is a webpage from the Library of Congress's website which sets forth the

7  numbers of items catalogued in the Library in 2013.  Exhibit N is an August 30, 2006 article from

8  *The Washington Post*'s website titled "FBI Shows Off Counterterrorism Database."  Exhibit Q is a

9  court filing in an unrelated FOIA case pending in another District, offered by Plaintiffs as evidence

10  of the facts of that case.[9]  As Plaintiffs offer each of these exhibits for the truth of the matters

11  asserted therein, *see* Fed. R. Evid. 801(c), they must identify any applicable hearsay exceptions.  *See*

12  Fed. R. Evid. 802, 803.  They have not done so.  Accordingly, the court grants Defendant's

13  objections and will not consider those exhibits in connection with this motion.

14                            **III. Legal Standards**

15  **A.      Summary Judgment**

16      A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

17  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of

18  establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

19  *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light

20  most favorable to the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted).

21  A genuine factual issue exists if, taking into account the burdens of production and proof that would

22  be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could

23  return a verdict in that party's favor.  *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The

24  court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *Id.* at

25  249.

26      To defeat summary judgment once the moving party has met its burden, the nonmoving party

27

28        [9] *Shapiro v. U.S. Dep't of Justice*, Case No. 1:13-cv-00595 (D.D.C. 2013).

may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted).  In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

Where, as here, the parties have filed cross-motions for summary judgment, "[e]ach motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  *Id.*

**B.      FOIA**

FOIA cases are typically decided on motions for summary judgment.  *Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, 625 F. Supp. 2d 885, 889 (N.D. Cal. 2009) (citing *Miscavige v. IRS*, 2 F.3d 366, 368 (11th Cir. 1993)).  The court reviews de novo an agency's action in response to a FOIA request, and "the burden is on the agency to sustain its action."  5 U.S.C. § 552(a)(4)(B).  "FOIA requires an agency responding to a request to demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents."  *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 986 (9th Cir. 2009) (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)); 5 U.S.C. § 552(a)(3)(C).  An agency may make this showing through "reasonably detailed, nonconclusory affidavits submitted in good faith."  *Zemansky*, 767 F.2d at 571 (citation omitted).  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.  The adequacy of the search, in turn, is judged by a standard of reasonableness and depends . . . upon the facts of each case."  *Id.* (citation omitted).  "There is no requirement that an agency search every record system," but the agency must conduct a good faith, reasonable search of those systems of records likely to possess requested records.  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

United States District Court

For the Northern District of California

"If an agency demonstrates that it has conducted a reasonably thorough search, the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith." *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993). Agency declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (internal quotation marks and citation omitted). "If the record raises substantial doubt as to the reasonableness of the search, especially in light of 'well-defined requests and positive indications of overlooked materials,' then summary judgment may be inappropriate." *Shapiro v. U.S. Dep't of Justice*, 37 F. Supp. 3d 7, 20 (D.D.C. March 12, 2014) (quoting *Founding Church of Scientology of Washington, D.C. v. NSA*, 610 F.2d 824, 837 (D.C. Cir. 1979)).

### IV. Discussion

The parties' cross motions for summary judgment present two issues: (1) the reasonableness of the FBI's search for responsive documents, and (2) the reasonableness of the EOUSA's search for responsive documents.

**A.     The FBI's Search for Responsive Documents**

**1.     Searches Performed**

With respect to Plaintiffs' FOIA requests to the FBI, Defendant relies on the declaration of David M. Hardy, the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division of the FBI. Hardy describes the search undertaken in response to Plaintiffs' requests, stating that "the FBI conducted a three-way phonetic search of its automated and manual indices to the CRS" using variants of Plaintiffs' names for the requested time periods. (Hardy Decl. ¶¶ 29, 32.) The FBI also used their dates of birth and social security numbers in combination with their name variants to try to locate potentially responsive files.

Hardy explains that CRS "enables the FBI to maintain information that it has acquired in the course of fulfilling its mandated law enforcement responsibilities," and contains "administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes." (Hardy Decl. ¶ 23.) CRS "consists of a numerical sequence of files, called FBI classifications, which are broken down according to subject matter. The subject matter of a file may relate to an individual,

**United States District Court**
For the Northern District of California

organization, company, publication, activity, or foreign intelligence matter (or program)."  (Hardy Decl. ¶ 23.)  The FBI searches the CRS through the Automated Case Support System ("ACS"), which Hardy describes as "an internal computerized subsystem of the CRS."  (Hardy Decl. ¶ 24.) "The retrieval of data from the CRS is made possible through the ACS using the General Indices (automated and manual), which are arranged in alphabetical order."  (Hardy Decl. ¶ 25.)  The manual indices, which are index cards, only contain records created before 1959.  (Hardy Decl. ¶ 30 n.10.)  There are two categories of entries in the General Indices: main entries and reference entries. "A main entry, or main file, carries the name corresponding with a subject of a file contained in the CRS," and "[a] reference entry, sometimes called a cross-reference, is generally only a mere mention or reference to an individual, organization, or other subject matter contained in a document located in another main file on a different subject matter."  (Hardy Decl. ¶ 25.)

Hardy explains that at the initial administrative stage, the FBI's policy "is to search for and identify only 'main' files responsive to FOIA/Privacy Act requests and subject to the FOIA," but in response to this litigation, it also searched CRS for main files and cross-reference records, using both the automated and manual indices.  (Hardy Decl. ¶¶ 30, 32.)

The ACS "consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases": Investigative Case Management ("ICM"), Electronic Case File ("ECF"), and Universal Index ("UNI").  (Hardy Decl. ¶ 27.)  "ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads."  ECF is "the central electronic repository for the FBI's official text-based documents," and UNI "provid[es] a complete subject/case index to all investigative and administrative cases."  UNI is an index of approximately 115.4 million records, and "functions to index names to cases, and to search names and cases for use in FBI investigations."  (Hardy Decl. ¶ 27.)  "The decision to index names other than subjects, suspects, and victims is a discretionary decision" usually made by an FBI Special Agent.  Hardy notes that "[t]he FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval."  (Hardy Decl. ¶ 28.)  Here, the FBI completed its index search by using ACS's UNI application.  (Hardy Decl. ¶¶ 29, 30, 32.)

United States District Court

For the Northern District of California

In response to this litigation, the FBI also searched its ELSUR (Electronic Surveillance) indices using four phonetic variations of each of Plaintiffs' names, along with their dates of birth and social security numbers.  The FBI uses its automated ELSUR indices "to maintain information on subjects whose electronic and/or voice communications have been intercepted as the result of a consensual electronic surveillance or a court-ordered (and/or sought) electronic surveillance conducted by the FBI."  These indices date back to January 1, 1960, and were automated in 1991. (Hardy Decl. ¶ 33.)  The ELSUR indices "include individuals who were the (a) targets of direct surveillance, (b) participants in monitored conversations, and (c) owners, lessors, or licensors of the premises where the FBI conducted electronic surveillance."  ELSUR also contains the date of monitoring, "a source number to identify the individual on whom the surveillance was installed," and the FBI field office that conducted the monitoring.  (Hardy Decl. ¶ 34.)

### 2.    Adequacy of the FBI's Search

Plaintiffs argue that the FBI's searches were inadequate both in their scope (systems searched) and their methodology (search terms and methods used).  They attach a number of exhibits that discuss the FBI's record management and retrieval methods, including ACS, and criticize the FBI's record-keeping practices as outdated.  The exhibits include commission reports, DOJ audits, and FBI responses at a Congressional hearing regarding the 9/11 Commission Report.  (Pls.' Mot. Exs. B, D, F, G, M.)  Plaintiffs also cite a National Archives report which describes shortcomings in the FBI's electronic file systems and concludes that they are inadequate, noting that the primary way that information is shared at the agency is through personal relationships.  (Pls.' Mot. Ex. A.) Plaintiffs detail "lesser-known" electronic systems such as Sentinel and Investigative Data Warehouse ("IDW").  They contend that Sentinel has more sophisticated search and indexing functionalities than ACS, and that IDW is an "uber-Google" system which is more comprehensive than ACS or ELSUR.  Plaintiffs assert that the FBI should have searched Sentinel and IDW for their names and key words.[10]  They also argue that Hardy's declaration is "boilerplate" and virtually

_____

[10] In their motion, Plaintiffs argue that a reasonable search would also include "a consultation of staff," including the regional offices where Plaintiffs resided and the "Joint Terrorism Task Force and Counter-Terrorism units, as staffs are known to conduct surveillance on Plaintiffs' clients and associates, political activists, and Plaintiffs' research areas."  (Pls.' Mot. 23.)  However, Plaintiffs did

United States District Court

For the Northern District of California

1    identical to those previously rejected as too conclusory in *Rosenfeld v. U.S. Dep't of Justice*, No. C

2    07-03240 MHP, 2008 WL 3925633, at *14 (N.D. Cal. Aug. 22, 2008) ("*Rosenfeld I*"), and

3    *Rosenfeld v. U.S. Dep't of Justice*, No. C 07-03240 MHP, 2010 WL 3448517, at *7 (N.D. Cal. Sept.

4    1, 2010) ("*Rosenfeld II*").  Plaintiffs argue that Hardy should have explained why other systems and

5    methods would have been unlikely to produce responsive records.

6         In response to Plaintiffs' argument that the FBI should have searched more systems and

7    sources, Defendant submit a supplemental declaration by Hardy in which he states that the CRS

8    consists of over 109.4 million records, and that "[g]iven its comprehensive nature, the CRS is the

9    principal records system that RIDS searches to locate responsive records; it is the records system

10   reasonably likely to contain records responsive to FOIA/PA requests."  (Hardy Decl., Dec. 8, 2014,

11   ¶ 5 ("2d Hardy Decl.").)  He states that "[w]hen a FOIA/PA request is made to the FBI for

12   information about individuals, an ACS index search of the CRS employing the UNI function is the

13   standard and rational starting point reasonably calculated to locate responsive records about them,

14   because ACS is the FBI's primary means by which records about individuals are found and used."

15   (2d Hardy Decl. ¶ 6.)

16        Defendant also addresses each of the additional systems identified by Plaintiffs.  First, Hardy

17   states that Sentinel, which is "the FBI's next generation case management system," did not replace

18   ACS.  "[T]he same type of information entered into ACS about individuals for the purpose of

19   indexing . . . is likewise entered into Sentinel for FBI records created after July 1, 2012 and this

20   same information is back-filled into ACS."  (2d Hardy Decl. ¶ 8.)  Therefore, a Sentinel search

21   would duplicate any information captured through a UNI search on ACS, which is a search the FBI

22   already performed for Plaintiffs.  (2d Hardy Decl. ¶ 8.)  The FBI nevertheless performed a Sentinel

23   search for purposes of these present motions.  The search did not identify any responsive records.

24   (2d Hardy Decl. ¶ 8.)

25        As for IDW, Plaintiffs assert that it is a more comprehensive system than ACS or ELSUR

26   and has greater search capabilities, and thus is more likely to retrieve responsive records.  In support

27   _____

28   not submit any evidence to support their claim that they or their associates have been subjected to
     surveillance.  Plaintiffs appear to have abandoned this argument in their reply.

14

United States District Court

For the Northern District of California

of their contention that IDW contains information not otherwise captured in CRS, Plaintiffs cite a document purporting to contain August 2004 testimony by an unnamed FBI representative.  That testimony, however, does not compare the contents of IDW and CRS.  (Pls.' Mot. Ex. M.)  Hardy explains that IDW was retired in 2012 and its functions were merged with the Data Integration and Visualization System ("DIVS"), an analytical tool that "assists agents and intelligence analysts to effectively sift through and prioritize data to support their ability to research, analyze, and investigate."  (2d Hardy Decl. ¶ 9.)  According to Hardy, "DIVS searches the vast CRS; therefore, DIVS would merely duplicate search efforts of the CRS already performed via ACS."  (2d Hardy Decl. ¶ 9.)

Although Hardy states that a DIVS search would duplicate a search of the CRS via ACS, his declaration is silent about DIVS's other capabilities.  Plaintiffs submit evidence on reply indicating that DIVS searches "hundreds of databases."  (Henry Decl., Dec. 22, 2014, Ex. A.)  At the hearing, the court ordered Defendant to provide supplemental evidence about DIVS, including the databases DIVS is capable of searching, and a description of any burden associated with a DIVS search.  Defense counsel indicated that the information requested by the court is sensitive, because it reveals investigative techniques used by law enforcement.   Defense counsel therefore requested permission to submit a responsive declaration solely for in camera review by the court.  (Hr'g Tr., Feb. 26, 2015, 4:24-5.)  The court ordered Defendant to e-file a redacted version of the requested evidence and to submit the unredacted version for in camera review.  The court also instructed Defendant to file a brief supporting its request for in camera review, and gave Plaintiffs the opportunity to file an opposition brief.  Both parties made timely filings.  [Docket Nos. 47 (Def.'s Suppl. Br.), 47-2 (Redacted Operational Declaration), 48 (Redacted 3d Hardy Decl.), 49 (Pls.' Suppl. Br.).]

In response to the court's order to submit further information regarding DIVS, Defendant submitted two declarations for in camera review: a third Hardy declaration and an "operational declaration."  Defendant filed redacted versions of these two declarations.  In its supplemental brief, Defendant states that it redacted sensitive law enforcement material from the publicly-filed versions of the declarations pursuant to the law enforcement privilege, including classified information about DIVS and identifying information about FBI personnel in the operational declaration.  Defendant

United States District Court

For the Northern District of California

1  argues that "the disclosure of [such information] would impede or impair the effectiveness of an

2  investigative technique, method, and procedure of the FBI."  (Def.'s Suppl. Br. 2.)  According to

3  Hardy, "DIVS is itself both an intelligence source and method and a sensitive investigative

4  technique used by the FBI."  (3d Hardy Decl. ¶ 27.)  *See In re Dep't of Investigation of City of New*

5  *York*, 856 F.2d 481, 484 (2d Cir. 1988) (purpose of law enforcement privilege "is to prevent

6  disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources,

7  to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved

8  in an investigation, and otherwise to prevent interference with an investigation."); *see also* 5 U.S.C.

9  § 552(b)(7) (FOIA exemption for records or information compiled for law enforcement purposes).

10  Plaintiffs oppose Defendant's in camera submission, arguing that the redacted declarations are

11  insufficiently detailed to overcome the strong presumption against secrecy and that Defendant's

12  arguments in support of in camera review are "vague and conclusory."  (Pls.' Suppl. Br. 2 (citing

13  *Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1083 (9th Cir. 2004)).)  They ask the court to

14  order Defendant to publicly file the full, unredacted declarations.

15      The court has performed a thorough in camera review of Defendant's supplemental

16  declarations regarding DIVS.  The court finds that Defendant has established that the information

17  contained in the declarations is protected from disclosure pursuant to the law enforcement privilege.

18  Further, the court finds that the publicly-filed versions of these declarations are sufficiently detailed

19  to warrant in camera review of the full declarations.  *See Lion Raisins*, 354 F.3d at 1084 ("the

20  district court must require the government to justify FOIA withholdings in as much detail as possible

21  on the public record before resorting to *in camera* review"; remanding with instructions to require

22  submission of detailed public declarations in support of law enforcement exemption to FOIA).

23      Further, having reviewed the supplemental declarations, the court finds that it would be

24  unreasonably burdensome for the FBI to search DIVS for responsive records in response to

25  Plaintiffs' FOIA requests.  First, DIVS pulls records from "multi-agency data sources."  Therefore,

26  requiring the FBI to conduct a DIVS search would drastically expand the scope of its search by

27  requiring the FBI to retrieve and review potentially responsive data from other government agencies.

28  (*See* 3d Hardy Decl. ¶¶ 12, 13.)  As noted above, the FBI's search of CRS, Sentinel and ELSUR

returned no responsive documents; requiring the FBI to search DIVS is therefore unwarranted.  A DIVS search would also unduly burden the FBI due to the high number of false positives it would return, because it functions similarly to an ECF text search (discussed further below), which returns a significant number of hits.  (3d Hardy Decl. ¶ 14.)  Specifically, an ECF text search allows users to look for specific names or keywords by electronically scanning the text of documents, which returns a significant number of hits that are generally random and incomplete references.  For example, ECF text searches return references consisting of only a first or a last name.  (3d Hardy Decl. ¶ 14.)  Similarly, in DIVS, every document within the datasets is text searchable and would likely trigger false positives, requiring an "astronomical" amount of time and resources to sift through.  (3d Hardy Decl. ¶¶ 14, 15.)

In sum, the court finds that the FBI's decision to search particular systems but not others was reasonable.  "There is no requirement that an agency search every record system" in its attempt to locate requested files; it simply must show that it conducted a good faith, reasonable search of those systems of records likely to possess requested records.  *Oglesby*, 920 F.2d at 68.  Here, the FBI explains that it searched CRS using ACS, which is the FBI's primary means by which records about individuals are found and used, including both main files and cross references.  The FBI also searched ELSUR and Sentinel.  These systems did not yield any responsive records, and therefore did not suggest that other systems are likely to contain responsive records.  *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998) (noting that "an agency 'cannot limit its search to only one record system if there are others that are likely to turn up the information requested'" and concluding that search of only CRS was insufficient "once the FBI discovered information suggesting the existence of documents that it could not locate without expanding the scope of its search" (quoting *Oglesby*, 920 F.2d at 68)).  The FBI also explained why it would be overly burdensome to search DIVS, especially in light of the fact that searches of other systems did not locate any responsive records.

Citing *Rosenfeld II,* Plaintiffs assert that to the extent any FBI system was not searched, the FBI must explain why the system was not searched.  That case is inapposite.  In *Rosenfeld II*, the plaintiff requested records related to former President Ronald Reagan.  The court ordered the FBI to

17

United States District Court

For the Northern District of California

provide information about its decision not to search additional databases, because the FBI's search of the CRS's indices and ELSUR returned responsive documents which contained references to other files (which were not produced).  2010 WL 3448517, at *4, 6-7.  Here, the FBI's search of CRS, Sentinel and ELSUR returned no responsive records.  Therefore, there is no indication that responsive records existed in other systems.

Plaintiffs also contend that the FBI's search methods were inadequate.  Plaintiffs assert that the FBI should have used the key words that they included in their FOIA requests.  Henry's request listed 37 key words, including names of organizations such as Alameda County Sheriff, California Appellate Project, and California Prison Focus, as well as assorted common words and phrases, such as anarchy, occupy, protest, radical, and watchlist.  Stout's request listed 36 key words which, like Henry's, ranged from names of organizations such as Drug Policy Alliance, National Lawyers Guild, and Rhode Island Patient Advocacy Coalition, to common phrases, including legal observer, board of directors, and demonstration.  Neither request included any context for the key words, and Plaintiffs did not provide date ranges or other identifiers that would link them to any of the key words or provide more information regarding the association between Plaintiffs and the listed organizations.  For these reasons, the FBI "determined that none of [the key words] constitute a valid search term[] that would assist in locating information about [Plaintiffs], if any exist."  (2d Hardy Decl. ¶ 15.)  Hardy states that given the extensive searches the FBI has already performed using variations of Plaintiffs' names, searches using these broad terms is not warranted and is unduly burdensome.  (2d Hardy Decl. ¶ 15.)

"[T]here is no bright-line rule requiring agencies to use the search terms proposed in a FOIA request."  *Physicians for Human Rights v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009).  Here, the FBI's multiple searches used variations on Plaintiffs' names and other identifying information.  These searches did not yield a single responsive record, nor did they uncover any information suggesting the existence of responsive records.  Plaintiffs' proposed key words are untethered from dates or events that are likely to be associated with Plaintiffs.  Under these circumstances, the court finds that the FBI's decision not to use Plaintiffs' proposed search terms was reasonable.

United States District Court

For the Northern District of California

1    Plaintiffs next assert that the FBI should have performed full-text searches of CRS using

2    ECF.  Plaintiffs cite a 2007 FBI Records Managment Manual which describes ECF as providing the

3    "capability of uploading word processing documents to the mainframe where they are filed and

4    serialized . . . and searching documents by both structured (i.e., formatted fields such as From/To)

5    and unstructured (i.e., full text) means."  (Pls.' Mot. Ex. I at 25.)  According to Plaintiffs, the FBI's

6    failure to conduct a full-text ECF search for Plaintiffs' names may mean that any non-indexed

7    references to their names were overlooked.  In response, Hardy explains that the FBI generally does

8    not perform full-text searches to locate records responsive to FOIA requests, because such searches

9    are considered "an extraordinary measure that is unduly burdensome and not reasonably likely to

10   locate responsive records."  (2d Hardy Decl. ¶ 10.)  According to Hardy, "[g]enerally, names that are

11   not indexed in the CRS via ACS are those deemed to have no long-lasting significance to the FBI,"

12   and "are usually incomplete and are unaccompanied by any other identifying information, such as a

13   date of birth, social security number, address, phone number, and so forth to assist in identifying an

14   individual."  (2d Hardy Decl. ¶ 10.)  He states that such searches "generally return a significant

15   number of 'hits' that are random and incomplete references" which are then subject to a time-

16   consuming review that uses a significant amount of resources, and which usually does not yield

17   additional responsive information.  (2d Hardy Decl. ¶ 10.)

18   Plaintiffs argue that this case is similar to *Shapiro v. Department of Justice*, 34 F. Supp. 3d

19   89, 92 (D.D.C. 2014), in which the plaintiff requested records regarding Aaron Swartz, a recently

20   deceased activist.  Plaintiffs note that in *Shapiro*, the court ordered the agency to either conduct a

21   full-text search as requested by the plaintiff, or provide a further explanation as to why it was

22   unnecessary.  *Id.* at 99.

23   *Shapiro* is distinguishable, and recognizes that "a full-text search may not be warranted in

24   every case."  *Id.* at 99.  First, the plaintiff in *Shapiro* asked the FBI to perform a full-text search;

25   here, Plaintiffs' FOIA requests asked for a search of the general and manual indices, which the FBI

26   performed.  While the form of the request is not determinative, an agency "is not obliged to look

27   beyond the four corners of the request for leads to the location of responsive documents."

28   *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996) (noting that "[t]his is not to say

19

1  that the agency may ignore what it cannot help but know.").  More importantly, in *Shapiro*, the

2  FBI's original search located responsive records.  *Shapiro*, 34 F. Supp. 3d at 98.  In this lawsuit,

3  Hardy states that there are extraordinary situations in which conducting full-text searches is

4  beneficial, including when a search of CRS locates no records but the FBI has reason to believe

5  responsive records likely exist, or when a CRS search results in some records located, but there is

6  information indicating that more records exist.  (Hardy Decl. II ¶ 11.)  As neither condition is

7  present here, the court finds that the burden of a full-text search is not warranted in this case.

8         In sum, the court finds that the FBI satisfied its FOIA obligations with respect to Plaintiffs'

9  requests by conducting good faith and reasonable searches of databases and systems likely to

10  possess records responsive to the requests.

11  **B.       Reasonableness of EOUSA's Searches**

12         As described above, Defendant relies upon the declarations of the FOIA/PA point persons in

13  each of the USAOs at issue here.  Each declarant described his or her search of the LIONS system,

14  as well as searches of other case databases, including PACER, and searches of archived cases.

15  Plaintiffs appear to criticize the searches on the grounds that "electronic searches appear less likely

16  to uncover responsive records than interpersonal relationships or paper file searches."  (Pls.' Mot.

17  16.)  They argue that the USAOs possess other regional and national-level search methods that were

18  not used, including EOUSA systems, the Federal Records Center where regional records are stored,

19  and the Master Index Application.

20         Defendant first responds that Plaintiffs did not provide a basis for their belief that national-

21  level searches were reasonable.  Plaintiffs' requests did not provide any information regarding

22  specific cases or investigations involving any USAO component with which Plaintiffs may have

23  been involved.  Each USAO prosecutes violations of federal law and represents the federal

24  government in litigation involving the United States in its respective District.  (Francis Decl., Dec. 8,

25  2014, ¶ 1 ("Francis Decl. II").)  Records for the matters handled by a particular USAO are

26  maintained at the District rather than national level.  (Francis Decl. II ¶ 1.)

27         As for the other systems identified by Plaintiffs, there is no evidence that these are

28  reasonably likely to contain records related to Plaintiffs.  First, regarding "EOUSA systems,"

1   EOUSA is the administrative arm of the United States Attorney's Office and does not maintain

2   records of the cases or matters handled at each District.  (Francis Decl. ¶ 1.)  As to the Federal

3   Records Center, it is a repository for closed cases.  (Francis Decl. II ¶ 4.)  However, because LIONS

4   tracks both closed and open cases, the searches conducted by the USAO offices would have

5   included any closed files forwarded to the Federal Records Center.  (Francis Decl. II ¶ 4.)  Finally,

6   the Master Index Application is a system of records used by the USAO for the District of Columbia

7   and contains information about cases brought in the United States District Court for the District of

8   Columbia or in the Superior Court for the District of Columbia.  (Francis Decl. II ¶ 3.)  Neither of

9   Plaintiffs' requests contained information suggesting that Henry or Stout were involved in cases

10  within that jurisdiction.  Accordingly, there is no reasonable basis to conclude that the Master Index

11  Application would be likely to locate responsive records.

12          The court concludes that EOUSA has adequately demonstrated that it "conducted a search

13  reasonably calculated to uncover all relevant documents."  *Zemansky*, 767 F.2d at 571.

14                                  **V. Conclusion**

15          For the foregoing reasons, Plaintiffs' motion for summary judgment is denied.  Defendant's

16  motion for summary judgment is granted.

17

18          IT IS SO ORDERED.

19

20  Dated: September 1, 2015



21                                          _____
                                            DONNA M. RYU
22                                          United States Magistrate Judge

23

24

25

26

27

28